THE PEOPLE OF THE STATE OF NEW YORK ex rel. ARTHUR F. BRODERICK, Respondent, *v.* HENRY M. GOLDFOGLE and Others, as Commissioners of Taxes and Assessments of the City of New York, Appellants. (Moneyed Capital Taxes of 1923.)

First Department, July 6, 1925.

Taxation — moneyed capital tax — Laws of 1923, chap. 897, amending Tax Law, not unconstitutional on ground of failure to define or establish any class of subjects of taxation by clear and definite standards — meaning of phrase "moneyed capital coming into competition with the business of National banks" in Tax Law, § 4-a and correlated sections, as amd., has been definitely defined — said phrase is not impracticable of application — class of taxable property to which statute applies clearly defined by act — no delegation of legislative power — statute does not contain arbitrary and unreasonable classification in contravention of United States Constitution, Fourteenth Amendment, § 1, — statute is not invalid on ground that it deprives taxpayer of property without due process of law in violation of United States Constitution, Fourteenth Amendment, § 1, and State Constitution, art. 1, § 6 — statute is not unconstitutional on ground of violation of State Constitution, art. 3, § 24 — said statute is not invalid on ground that section 27 thereof is invalid for failure to comply with State Constitution, art. 3, § 21, or on ground that said section violates State Constitution, art. 8, § 9 — said section 27 is severable from remainder of act — statute did not become law too late to authorize assessment under it for year 1923 — money invested and used in stock brokerage concern and for seat on Stock Exchange does not come into competition with business of National banks and is not taxable under said statute.

Chapter 897 of the Laws of 1923, amending the Tax Law and providing in section 4-a and correlated sections of the Tax Law for the taxation of "moneyed capital coming into competition with the business of National banks," is not unconsti-

tutional on the ground that it fails to define or establish any class of subjects of taxation by clear or definite standards by reference to which the assessors may ascertain and assess the taxable property.

The quoted phrase has been clearly defined by the decisions of the United States Supreme Court to mean that moneyed capital is to be distinguished from personal property; that moneyed capital does not mean all capital, the value of which is measured in terms of money; that moneyed capital includes interest of individuals in all enterprises in which the capital employed in carrying on the business is money and where the object of the business is the making of profit by its use as money; and that corporations and individuals owning such moneyed capital and therewith carrying on operations forming a substantial part of the business of National banks should be taxed equally with the shares of National banks.

It follows from the definition given that mere ownership of moneyed capital, whether in the form of investments or otherwise, is not sufficient to bring such moneyed capital within the intention and scope of the statute, but that to come within such intention and scope the moneyed capital must be in the form of investments in enterprises or operations such as the National banks in their business engage in, or that the moneyed capital, whether in the form of investments or otherwise, must be used in such operations as are engaged in by National banks in their business, and that only such moneyed capital so used, or investments so made, are to be regarded as coming into competition with the business of National banks.

Said phrase is not impracticable of application, for while practical difficulties may arise in the action of local assessing bodies in determining what capital does, and what does not, come within its scope, these are difficulties which must arise under any taxing law, and all that the statute can reasonably be expected to contain is a classification or rule having a settled or definite meaning.

The class of property subject to the tax is defined in the statute with sufficient clarity, and the assessing officers are charged with the duty of determining what property comes within its scope with recourse to the courts in case any party deems himself aggrieved by their actions.

There is no lack of uniformity in the statute, for the class of taxable property to which it applies is uniformly defined by the phrase quoted and the only question to be determined by the assessing officers is what property answers the description given in the statute.

The statute does not delegate legislative power to the local boards of assessors, for the property to be taxed having been clearly prescribed by the Legislature, the sole duty of the assessors is upon the facts before them in each case to make the assessment as directed by the statute, and the fact that the exercise by the local boards of the duties imposed may require a consideration of changing conditions, offers no valid objection.

There is not an arbitrary and unreasonable classification in the statute in contravention of section 1 of the Fourteenth Amendment to the Constitution of the United States.

The statute is not unconstitutional on the ground that it deprives the taxpayer of his property without due process of law in violation of section 1 of the Fourteenth Amendment of the Constitution of the United States and section 6 of article 1 of the Constitution of the State of New York, providing that no person shall be deprived of his property without due process of law, for the statute itself provides for proceedings by assessors, including a hearing after the assessment is made and due notice given, and a writ of certiorari to review the assessors' determination in case the taxpayer feels himself aggrieved.

The statute is not unconstitutional on the ground that it is in contravention of the specific provisions of section 24 of article 3 of the Constitution of the State of New York, which section provides that every law that imposes a tax shall distinctly state the tax and the object to which it shall be applied and that it shall not be sufficient to refer to any other law to fix such tax or object, for the statute is an amendment to the Tax Law of the State of New York and does not come within the provisions of section 24 of article 3 of the State Constitution.

The entire statute will not be held invalid on the ground that section 27 thereof, relating to a refund or deduction, contravenes the requirements of section 21 of article 3 of the Constitution of the State of New York, in reference to the appropriation of money by the Legislature, and section 9 of article 8 of the Constitution of the State of New York in reference to the loaning of the credit of the State, for said section is clearly severable from the essential provisions of the statute, and if it were invalid on the ground stated, its invalidity would not destroy the rest of the statute, and, furthermore, since there was no moneyed capital local tax for the year 1922, there can be no refund, and thus the argument of invalidity because no appropriation was made for such refund is academic.

The contention that the statute became a law too late to authorize assessments under it for the year 1923 is without merit.

Money invested by the relator in a stock brokerage concern, which deals in stocks, bonds and commodities for cash, in execution of orders for customers, and which deals on its own account in stocks, bonds and evidences of debt, including the underwriting of stock sold, does not come into competition with the business of National banks and is not taxable.

Furthermore, the fact that the stock brokerage concern purchases and sells stocks, bonds and commodities for its customers upon marginal account, upon commission, and in the transaction of that business loans to the customer the difference between the cash deposited and the value of the security purchased, which loan is made possible by the fact that the stock brokerage concern borrows money from banks, trust companies and individuals, at times rehypothecating stocks and bonds delivered to it as collateral, and advances the difference between the amount borrowed and the amount of cash paid to the customer, does not constitute investment of money in competition with the business of National banks, but, as a matter of fact, results in supplying National banks with business through loans made on rehypothecated stock.

The amount invested by the relator in its Stock Exchange seat, which seat is used in the transaction of the business of the firm, is not an investment coming into competition with the business of National banks, for the simple reason that National banks cannot own memberships in an exchange nor trade or deal in stocks.

APPEAL by the defendants, Henry M. Goldfogle and others, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 5th day of January, 1925, in certiorari proceedings brought to review assessments on property of the relator, under the Laws of 1923, chapter 897, amending the Tax Law and known as the Moneyed Capital Tax Law, directing that the assessment of $100,000 made by the defendants for the purposes of taxation for the year 1923, against the relator on the value of moneyed capital

owned or held by the relator, coming into competition with the business of National banks, be vacated and canceled.

The opinion of the Special Term is reported in *People ex rel. Broderick* v. *Goldfogle* (123 Misc. 399).

*George P. Nicholson, Corporation Counsel* [*William H. King* of counsel; *Eugene Fay* with him on the brief], for the appellants.

*John W. Davis* and *Michael F. Dee,* for the respondent.

*Wilder, Ewen & Patterson* [*John Ewen* of counsel], for Charles A. Frank and another, *amici curiæ.*

*Blake, Durham, deMilhau & Conwell* [*Knowlton Durham* of counsel], for Robert L. Bigelow and others, *amici curiæ.*

*House, Grossman & Vorhaus* [*Louis J. Vorhaus* of counsel], for Louis M. Josephthal and others, *amici curiæ.*

*Greenbaum, Wolff & Ernst* [*Edward S. Greenbaum* of counsel], for Sidney S. Prince and others, *amici curiæ.*

Dowling, J.:

As the constitutionality of chapter 897 of the Laws of 1923, amending the Tax Law and known as the Moneyed Capital Tax Law, is attacked by the relators, respondents, in this and the two following cases, it is requisite that this question should be dealt with at the outset, before considering the state of facts in each particular case which is claimed to justify the imposition of the tax provided by that statute.

The legislation is the result of the decision in the case of *People ex rel. Hanover National Bank* v. *Goldfogle* (234 N. Y. 345), rendered in 1922. (Motion for reargument denied, 235 N. Y. 506; writ of certiorari denied by United States Supreme Court, *Goldfogle* v. *Hanover National Bank,* 261 U. S. 620.) There the question involved was the validity of the capital stock tax imposed upon the book value of shares of stock in all banks and banking associations by section 24-b of the Tax Law (as added by Laws of 1916, chap. 323),* while at the same time competing moneyed capital in the hands of individuals was exempt from said tax by section 4-a of the Tax Law (as added by Laws of 1920, chap. 647), which exempted from taxation locally for State or local purposes intangible personal property, except shares of stock of banks or banking associations.

This legislation was attacked upon the ground of discrimination, and that such taxes upon National bank shares were in contravention of section 5219 of the United States Revised Statutes, granting leave to States to tax such shares, which required that the rate

---

* Since amd. by Laws of 1923, chap. 897.— [Rep.

of taxation upon the shares should not be greater than was assessed upon other moneyed capital in the hands of individual citizens of the State. The same provision was contained in section 24 of the Tax Law (as amd. by Laws of 1916, chap. 323) until its repeal by chapter 603 of the Laws of 1922 (amdg. said Tax Law, § 24).

In holding the statute invalid as to National bank stock the Court of Appeals said in the *Hanover* case (at p. 354): " When it appears on the face of the statute that bank shares are taxed on valuation at a flat rate and that the owner of competing moneyed capital relatively material in amount is taxed on income only, the court is powerless to say that equality of taxation has been secured and injustice prevented. We are forced to compare two methods which are wholly unlike. How can equality be established or presumed as the necessary result of the taxing statutes? In a very considerable number of cases the valuation tax must inevitably be the heavier burden. It is fixed and certain. The income tax is variable and dependent on income and amount of income. It is conceivable that when returns on such capital are low, the bank stock would be taxed and the competing capital would be exempt. In no event would equality exist unless the income on competing capital were large beyond the dreams of avarice and the usual returns on investments."

It is stated that as the result of such decision the amounts already paid as taxes on bank shares with the interest thereon, for the years 1920, 1921 and 1922, amounting to about $30,000,000, were required to be refunded, and the localities in the State were deprived of the income from such taxation for ensuing years.

The decision in the *Hanover Bank* case was handed down in December, 1922. In 1921 the United States Supreme Court had decided the case of *Merchants' National Bank* v. *City of Richmond* (256 U. S. 635). The precise point therein presented for determination was whether the Virginia statute and the ordinance of the city of Richmond providing only for equal *ad valorem* taxation of shares of National and State banks while other moneyed capital was assessed at a lower rate, sufficiently complied with the provisions of section 5219 of the United States Revised Statutes that the rate of taxation upon shares of National banks should " not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens " of the State.

The city of Richmond contended that under decisions of the courts interpreting such section only equality of taxation as between shares of National and State banks was required.

The United States Supreme Court held against this contention, saying (at p. 638): " The Supreme Court of Appeals [of Virginia]

entertained the view that the purpose of § 5219, Rev. Stats., was confined to the prevention of discrimination by the States in favor of State banking associations as against National banking associations, and that since none such is shown here.there was no repugnance to the.Federal statute. This, however, is too narrow a view of § 5219."

After referring to the amendment of 1868 to section 41 of the National Bank Act of 1864 (13 U. S. Stat. at Large, 111, 112, § 41, as amd. by 15 id. 34, chap. 7), which was carried into section 5219 of the United States Revised Statutes, and stating that by repeated decisions, which were cited, it had become established that the provisions thereof related not only to shares of banking corporations but also to capital in private banking and investments of individuals such as " normally enter into the business of banking," the court as the basis for its determination (p. 640) expressly cited and relied upon the decision in *Mercantile Bank* v. *New York* (121 U. S. 138), saying that moneys and investments of individuals " employed in a similar way " were to be regarded.

The court thus showed no intended departure from the principles established in the *Mercantile Bank* case, consistently followed in subsequent decisions interpreting and applying section 5219 of the United States Revised Statutes. And the court, again referring to the *Mercantile Bank* case and to the cases subsequently decided of *Amoskeag Savings Bank* v. *Purdy* (231 U. S. 373, 390, 391); *Bank of Commerce* v. *Seattle* (166 id. 463, 464), and *First National Bank of Wellington* v. *Chapman* (173 id. 205, 219) further said (at p. 641): " No decision of this court to which our attention is called has qualified that rule, or construed § 5219 as leaving out of consideration the rate of State taxation imposed upon moneyed capital in the hands of individual citizens * * * where such moneyed capital comes into competition with that of the National banks."

The court said (at p. 638) that " It also was shown by evidence without dispute that moneyed capital in the hands of individuals invested in bonds, notes, and other evidences of indebtedness comes into competition with the National banks in the loan market." The court made a finding to this effect, and that the amount so invested was substantial, and declared the taxes imposed on the shares of the National bank invalid.

In order to clear up any doubts as to the extent to which National bank shares might be taxed and to provide for income taxation, if desired, Congress, in March, 1923, amended section 5219 of the United States Revised Statutes (42 U. S. Stat. at Large, 1499, chap. 267) so as to read as follows:

" Sec. 5219. The Legislature of each State may determine and

direct, subject to the provisions of this section, the manner and place of taxing all the shares of National banking associations located within its limits. The several States may tax said shares, or include dividends derived therefrom in the taxable income of an owner or holder thereof, or tax the income of such associations, provided the following conditions are complied with:

" 1. (a) The imposition by said State of any one of the above three forms of taxation shall be in lieu of the others.

" (b) In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of National banks: Provided, That bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section.

" (c) In case of a tax on the net income of an association, the rate shall not be higher than the rate assessed upon other financial corporations nor higher than the highest of the rates assessed by the taxing State upon the net income of mercantile, manufacturing, and business corporations doing business within its limits.

" (d) In case the dividends derived from the said shares are taxed, the tax shall not be at a greater rate than is assessed upon the net income from other moneyed capital.

" 2. The shares or the net income as above provided of any National banking association owned by nonresidents of any State, or the dividends on such shares owned by such nonresidents, shall be taxed in the taxing district where the association is located and not elsewhere; and such associations shall make return of such income and pay the tax thereon as agent of such nonresident shareholders.

" 3. Nothing herein shall be construed to exempt the real property of associations from taxation in any State or in any subdivision thereof, to the same extent, according to its value, as other real property is taxed.

" 4. The provisions of section 5219 of the Revised Statutes of the United States as heretofore in force shall not prevent the legalizing, ratifying, or confirming by the States of any tax heretofore paid, levied, or assessed upon the shares of National banks, or the collecting thereof, to the extent that such tax would be valid under said section."

The record of the discussion of the bill in both Houses of Congress is most illuminating as to what was sought to be accomplished thereby.

With section 5219 of the United States Revised Statutes in the amended form above given, conferences of public officials were held, as the result of which the Tax Law was amended by chapter 897 of the Laws of 1923, and as the Governor of the State said in his memorandum approving the act, " the language defining the scope of the bill is taken in its entirety from the decisions of the Courts and the Federal statutes."

The effect of the new system of taxation thus inaugurated may be epitomized as follows:

The Federal statute, as stated both in the House and in the Senate, was intended and deemed to express the old basic rule, as given judicial determination by numerous decisions prior to the *Richmond* decision, which rule was clear and easily understood, and also was intended and deemed to fully meet any ambiguity of the *Richmond* case, and without question to confine the moneyed capital to be taxed as competing with the business of National banks, to that engaged or employed in business or operations such as National banks conduct in their general banking business.

The exact words of such statute and of the decisions were, to avoid any uncertainty, adopted in the State act which amended the General Tax Law of the State by inserting new sections, changing other sections and continuing still others without change.

As so amended, the General Tax Law provided: For the local assessment annually of shares of National and State banks at the rate of one per cent upon the basis of the capital stock, surplus and undivided profits of the banks divided by the number of shares; for the assessment by the State annually of a franchise tax on trust companies equal to one per cent of the capital stock, surplus and undivided profits; for the local assessment and taxation of owners and holders of other moneyed capital coming into competition with the business of National banks at one per cent of the actual value thereof; and for State taxation of franchises of foreign bankers and foreign investors doing business in the State at one per cent of the amount of moneyed capital invested in such business. It also provided for exclusion of income from shares of banks and trust companies and moneyed capital locally taxable, from State income and franchise taxes.

As to local assessment of moneyed capital, the assessment and taxation provided, as stated in the amendment of section 4-a of the Tax Law (added by Laws of 1920, chap. 647, as amd. by Laws of 1923, chap. 897), was, in the exact language of section 5219 of the United States Revised Statutes (as amd. *supra*), of " other moneyed capital coming into competition with the business of National banks * * * provided that bonds, notes, or other evidences of indebted-

ness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section."

Similar words were contained in section 14 of the Tax Law (as amd. by Laws of 1923, chap. 897), providing that owners or holders of such moneyed capital were taxable; in section 23-a of said Tax Law (as added by Laws of 1923, chap. 897), providing for annual reports on or before June first as of May first in each year, the taxable status date for such taxation thus being the same date as for taxation of bank shares (Tax Law, § 23, as amd. by Laws of 1917, chap. 153); and in section 25 of said Tax Law (as amd. by Laws of 1923, chap. 897), stating how such moneyed capital should be assessed. The rate of tax upon moneyed capital at one per cent of the actual value thereof is prescribed by section 25-b of the Tax Law (as added by Laws of 1923, chap. 897).

Such annual assessments were, like the assessments of shares of banks, to be completed by the assessors, in accordance with section 36 of the Tax Law (as amd. by Laws of 1916, chap. 323; since amd. by Laws of 1924, chap. 491), on or before August first, and thereupon notices in accordance with such section and with section 25-a of said Tax Law (as added by Laws of 1923, chap. 897; since amd. by Laws of 1924, chap. 491) were to be given of such completion and of the assessments made, and that the assessments were open for public examination, and that on the third Tuesday of August the assessors would meet to hear any complaints. Pursuant to section 37 of the Tax Law (as amd. by Laws of 1916, chap. 323; since amd. by Laws of 1924, chap. 491) complaints were to be heard and determined by the assessors, and pursuant to section 39 of the Tax Law (as amd. by Laws of 1918, chap. 279; since amd. by Laws of 1924, chap. 491) the assessment roll of such assessments was to be completed and filed by September first and thereupon be open for public inspection and notice thereof given.

Thereafter, pursuant to section 25-d of the Tax Law (as added by Laws of 1923, chap. 897), statements of the moneyed capital tax at one per cent and of the assessments made, were to be given by December fifteenth to the persons assessed, and copies of such statements were, in the city of New York, to be sent to the receiver of taxes; and pursuant to section 25-f of the Tax Law (as added by Laws of 1923, chap. 897; since amd. by Laws of 1924, chap. 2), the tax was payable by December thirty-first to the receiver of taxes. Similar notices and statements of the assessments made and taxes levied upon shares of banks were and are required to be given and the bank tax was and is likewise payable by December thirty-first to

the receiver of taxes. (See Tax Law, § 24-a, as added by Laws of 1916, chap. 323; Id. §§ 24-d, 24-f, added by Laws of 1916, chap. 323, as amd. by Laws of 1917, chap. 153. See, also, Laws of 1924, chap. 2, since amdg. said § 24-f.)

Parallel duties by local assessors were thus required in the assessment of shares of banks and of owners and holders of such competing moneyed capital and with all these there was due compliance.

During June and July, 1923, the defendants prepared an assessment roll of assessments of moneyed capital taxable in the city of New York for the year 1923 in accordance with the provisions of the Tax Law as amended by chapter 897 of the Laws of 1923, and notified corporations, associations and individuals owning or holding such moneyed capital to furnish them with sworn statements of the actual value of such moneyed capital on May 1, 1923, the taxable status date, and received and examined all such statements furnished in response to the notification or otherwise, and from such statements and from information obtained by them with the assistance of their Deputy Tax Commissioners and other members of the department of taxes and assessments, they ascertained the names and addresses of all who it appeared to them owned or held such taxable moneyed capital, and the respective amounts thereof, and during said months they entered such names and addresses and opposite thereto the respective amounts which they determined and fixed as the actual value thereof so owned or held on said date. Such assessment roll the defendants completed before August 1, 1923, and placed it open for inspection in their office, and thereupon duly gave, as required by sections 36 and 25-a of the Tax Law, public notice, and also notice to such owners or holders, of such completion and of the assessments respectively made, and that the roll was open to inspection until the third Tuesday of August, 1923, and that on that date the defendants would meet in their office to hear and determine complaints in relation to the assessments, as provided by section 37 of the Tax Law.

On the third Tuesday of August, as provided by that section, the defendants so met and received and heard complaints and assigned adjourned times for hearings during that and the following week and at such times heard complaints.

On or before September 1, 1923, they determined all said complaints and fixed the assessments at amounts which they determined to be the actual value of taxable moneyed capital of the respective owners or holders owned or held on May 1, 1923, and on September first they finally completed, verified and filed for inspection the roll containing such assessments and gave notice thereof as required by section 39 of the Tax Law, and said roll duly remained open to

public inspection as required by said section. After the filing of the roll on September 1, 1923; the relator applied for and obtained from the court a writ of certiorari to which a return was made, and upon the issues raised by the petition and return the proceedings came on for trial.

The act is attacked, *first*, upon the ground that it is invalid because of indefiniteness, impracticability, lack of uniformity and delegation of legislative power. The relators contend that in lifting the description " moneyed capital coming into competition with the business of National banks " bodily out of the act of Congress and putting it into their own law the legislators wholly failed to define or establish any class of subjects of taxation by clear or definite standards by reference to which the assessors might ascertain and assess the taxable property; that they merely passed on to the assessors a function which was essentially and inherently a legislative function and in effect delegated to the assessing officers the determination of what should and what should not be taxed.

The meaning of the phrase " moneyed capital coming into competition with the business of National banks " is, it seems to me, sufficiently definite in meaning, in view of the Federal decisions. Thus in *Mercantile Bank* v. *New York* (121 U. S. 138), decided in 1887, the court stated that " The key to the proper interpretation of the act of Congress is its policy and purpose; " that the object of the law was to establish a system of National banking institutions to provide a uniform and secure currency and facilitate the operations of the treasury of the United States; that it was required that the capital, so far as it was security for circulating notes, should be invested in bonds of the United States; that such bonds were not subjects of taxation; and that neither the banks, their capital nor their shares could be taxed by the States without the consent of Congress as the banks were means and agencies established by Congress in execution of the powers of the government of the United States. It then said (at p. 154): " It was deemed consistent, however, with these National uses, and otherwise expedient, to grant to the States the authority to tax them [viz., shares of National banks] within the limits of a rule prescribed by the law. In fixing those limits it became necessary to prohibit the States from imposing such a burden as would prevent the capital of individuals from freely seeking investment in institutions which it was the express object of the law to establish and promote. The business of banking, including all the operations which distinguish it, might be carried on under State laws, either by corporations or private persons, and capital in the form of money might be invested and employed by individual citizens in many single and separate opera-

tions forming substantial parts of the business of banking. A tax upon the money of individuals, invested in the form of shares of stock in National banks, would diminish their value as an investment and drive the capital so invested from this employment, if at the same time similar investments and similar employments under the authority of State laws were exempt from an equal burden. The main purpose, therefore, of Congress, in fixing limits to State taxation on investments in the shares of National banks, was to render it impossible for the State, in levying such a tax, to create and foster an unequal and unfriendly competition, by favoring institutions or individuals carrying on a similar business and operations and investments of a like character. The language of the act of Congress is to be read in the light of this policy."

The court thus distinctly held that the business of banking and single and separate operations forming a substantial part of the business of banking were to be considered, and that institutions and individuals carrying on such business and operations were not to be favored.

It then, referring to what moneyed capital might be used in such business and operations, said (at p. 155): "Applying this rule of construction, we are led, in the first place, to consider the meaning of the words ' other moneyed capital,' as used in the statute. Of course it includes shares in National banks; the use of the word ' other ' requires that. If bank shares were not moneyed capital, the word ' other ' in this connection would be without significance. But ' moneyed capital ' does not mean all capital the value of which is measured in terms of money. In this sense, all kinds of real and personal property would be embraced by it, for they all have an estimated value as the subjects of sale. Neither does it necessarily include all forms of investment in which the interest of the owner is expressed in money. Shares of stock in railroad companies, mining companies, manufacturing companies, and other corporations, are represented by certificates showing that the owner is entitled to an interest, expressed in money value, in the entire capital and property of the corporation, but the property of the corporation which constitutes its invested capital may consist mainly of real and personal property, which, in the hands of individuals, no one would think of calling moneyed capital, and its business may not consist in any kind of dealing in money; or commercial representatives of money. So far as the policy of the government in reference to National banks is concerned, it is indifferent how the States may choose to tax such corporations as those just mentioned, or the interests of individuals in them, or whether they should be taxed at all. Whether * * * taxed or exempt * * *

would have no effect upon the success of National banks. There is no reason, therefore, to suppose that Congress intended, in respect to these matters, to interfere with the power and policy of the States. The business of banking, as defined by law and custom, consists in the issue of notes payable on demand, intended to circulate as money where the banks are banks of issue; in receiving deposits payable on demand; in discounting commercial paper; making loans of money on collateral security; buying and selling bills of exchange; negotiating loans, and dealing in negotiable securities issued by the government, State and National, and municipal and other corporations. These are the operations in which the capital invested in National banks is employed, and it is the nature of that employment which constitutes it in the eye of this statute ' moneyed capital.' Corporations and individuals carrying on these operations do come into competition with the business of National banks, and capital  *  *  *  thus employed is what is intended to be described by the act of Congress."

And after stating that shares of stock held by individuals in companies such as railroad, mining, insurance or any other corporations of that description, are not moneyed capital, although such companies may have a large part of their capital invested in securities payable in money and so may be the owners of moneyed capital, the court said (at p. 157): " The terms of the act of Congress, therefore, include shares of stock or other interest owned by individuals in all enterprises in which the capital employed in carrying on its business is money, where the object of the business is the making of profit by its use as money. The moneyed capital thus employed is invested for that purpose in securities by way of loan, discount, or otherwise, which are from time to time, according to the rules of the business, reduced again to money and reinvested. It includes money in the hands of individuals employed in a similar way, invested in loans, or in securities for the payment of money, either as an investment of a permanent character, or temporarily with a view to sale or repayment and reinvestment. In this way the moneyed capital in the hands of individuals is distinguished from what is known generally as personal property."

The court thus very clearly pointed out (1) that moneyed capital is to be distinguished from personal property; (2) that moneyed capital does not mean all capital the value of which is measured in terms of money; (3) that moneyed capital includes interest of individuals in all enterprises in which the capital employed in carrying on the business is money and where the object of the business is the making of profit by its use as money; and (4) that

44

corporations and individuals owning such moneyed capital and therewith carrying on operations forming substantial parts of the business of National banks should be taxed equally with the shares of National banks to avoid unequal and unfriendly competition and to avoid favoring institutions and individuals carrying on such similar business and operations of like character, the object of Congress being to establish and promote the success of National banks.

It thus follows that mere ownership of moneyed capital, whether in the form of investments or otherwise, is not sufficient to bring such moneyed capital within the intention and scope of the act; that to come within such intention and scope the moneyed capital must be in the form of investments in enterprises or operations such as the banks in their business engage in or that the moneyed capital, whether in the form of investments or otherwise must be used in such operations as are engaged in by the banks in their business; and that only such moneyed capital so used or invest- ments so made are to be regarded as coming into competition with the business of National banks.

In reaching this conclusion as to the intent and scope of section 5219 of the United States Revised Statutes, the court thus virtually construed it as referring expressly not to " moneyed capital in the hands of individual citizens," but to " moneyed capital coming into competition with the business of National banks," and accurately defined the meaning of these words.

In *Aberdeen Bank* v. *Chehalis County* (166 U. S. 440) the court referred to and quoted from the opinion in the *Mercantile* case, and said (at p. 460): " The conclusions to be deduced from these deci- sions are that money invested in corporations or in individual enterprises that carry on the business of railroads, of manufacturing enterprises, mining investments and investments in mortgages, does not come into competition with the business of National banks, and is not therefore within the meaning of the act of Congress; that such stocks as those in insurance companies may be legiti- mately taxed on income instead of on value, because such companies are not competitors for business with National banks; and that exemptions, however large, of deposits in savings banks, or of moneys belonging to charitable institutions, if exempted for reasons of public policy and not as an unfriendly discrimination against investments in National bank shares, should not be regarded as for- bidden by section 5219 of the Revised Statutes of the United States," and (at p. 461): " Even if it be conceded that the stocks and bonds of insurance, wharf and gas companies were, in point of fact, exempted from taxation, such companies are not, as we have seen, competitors

for business with the National banks, and, therefore, might be legally exempted. As to the sum of $237,400, alleged to be invested by individual citizens of Chehalis County in loans and securities to them payable and owing by other citizens of that county, we are not informed by the bill of the nature of such loans and securities, and, as against the pleader, we may well assume that they belong to a class of investments which does not compete with the business of National banks."

In *Merchants' National Bank* v. *City of Richmond* (256 U. S. 635) the court said (at p. 639): " By repeated decisions of this court, dealing with the restriction here imposed, it has become established that, while the words ' moneyed capital in the hands of individual citizens ' do not include shares of stock in corporations that do not enter into competition with the National banks, they do include something besides shares in banking corporations and others that enter into direct competition with those banks. They include not only moneys invested in private banking, properly so called, but investments of individuals in securities that represent money at interest and other evidences of indebtedness such as normally enter into the business of banking. In *Evansville Bank* v. *Britton,* 105 U. S. 322, 324, the Court said: ' The act of Congress does not make the tax on personal property the measure of the tax on bank shares in the State, but the tax on moneyed capital in the hands of the individual citizens. Credits, money loaned at interest, and demands against persons or corporations are more purely representative of moneyed capital than personal property, so far as they can be said to differ. Undoubtedly there may be much personal property exempt from taxation without giving bank shares a right to similar exemption, because personal property is not necessarily moneyed capital. But the rights, credits, demands, and money at interest mentioned in the Indiana statute, from which *bona fide* debts may be deducted, all mean moneyed capital invested in that way. * * * We are of opinion that the taxation of bank shares by the Indiana statute, without permitting the shareholder to deduct from their assessed value the amount of his *bona fide* indebtedness, as in the case of other investments of moneyed capital, is a discrimination forbidden by the act of Congress.' "

After referring to, and quoting from, *Mercantile Bank* v. *New York,* the court said further (at p. 641): " In *Amoskeag Savings Bank* v. *Purdy,* 231 U. S. 373, 390–391, the above-mentioned declaration of the court in *Mercantile Bank* v. *New York,* 121 U. S. 138, 157, including the citation from *Evansville Bank* v. *Britton,* was repeated, and it was pointed out that the rule of construction thus laid down had since been consistently adhered to. No decision of

this Court to which our attention is called has qualified that rule, or construed § 5219 as leaving out of consideration the rate of State taxation imposed upon moneyed capital in the hands of indi-vidual citizens invested in loans or securities for the payment of money, either for permanent or temporary purposes, where such moneyed capital comes into competition with that of the National banks. Thus, in *Bank of Commerce* v. *Seattle,* 166 U. S. 463, 464, the precise ground of decision was the want of a showing that ' the moneyed capital left unassessed was, as to any material portion thereof, moneyed capital coming into competition with that of National banks.' To the same effect *First National Bank of Wellington* v. *Chapman,* 173 U. S. 205, 219. In the present case, there is a clear showing of such competition, relatively material in amount, and it follows that, upon the undisputed facts, the ordinance and statute under which the stock of plaintiff in error was assessed, as construed and applied, exceeded the limitation prescribed by § 5219, Rev. Stats., and hence that the tax is invalid."

The phrase is not impracticable of application. Practical difficulties may arise in the action of local assessing bodies in determining what capital does, and what does not, come within its scope. But these are difficulties which must arise under any taxing law. All that the statute can reasonably be expected to contain is a classification or rule having a settled and definite meaning, and then the local boards must determine to what property it applies. It is not easy to see how a clearer statement of the class of property sought to be reached by taxation could be found, than in the use of a phrase adopted by Congress and with a settled meaning fixed by the United States Supreme Court.

In *Des Moines National Bank* v. *Fairweather* (263 U. S. 103) a taxing statute of the State of Iowa was upheld which read: "All moneyed capital within the meaning of section five thousand two hundred and nineteen (5219) of the Revised Statutes of the United States shall be listed and assessed against the owner thereof at his place of business, and if a corporation at its principal place of business, at the same rate as State, savings, National bank and loan and trust company stock is taxed, in the same taxing district, and at the actual value of the moneyed capital so invested. The person or corporation using moneyed capital in competition with bank capital shall furnish the assessor upon demand a full and complete itemized sworn statement showing the amount of moneyed capital so used." (See Iowa Laws of 1911, chap. 63, § 1, amdg. Code of Iowa [1897], § 1310. See, also, 34 Iowa G. A. 45; Supp. Code of Iowa [1913], § 1310; now Code of Iowa [1924], §§ 7005, 7006.)

The language used in the New York statute is almost identical

with that used in chapter 391 of the Laws of 1923 of the State of Wisconsin, amending section 70.37 of and adding sections 70.404 and 70.405 to the Wisconsin Statutes, " relating to the taxation of banks or banking associations and corporations, partnerships, and individuals employing moneyed capital in competition with National banks," in section 2 of which (adding said section 70.404) it is provided: " The term ' bank ' or ' banking association ' shall include all corporations, associations, partnerships, and individuals engaged in the banking or investment business and employing moneyed capital in competition with the business of National banks; provided, that bonds, notes or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section." (See, also, Wisconsin Statutes [1923], § 70.404.)

A like claim of unconstitutionality because of impracticability was made in *People ex rel. Met. St. R. Co.* v. *Tax Comrs.* (79 App. Div. 183; revd., 174 N. Y. 417) which was brought to test the validity of the provisions of the Tax Law imposing taxes on special franchises. Therein Judge ROBERT EARL, acting as referee, held against the claim, and in his opinion, not officially reported but referred to with approval by the Court of Appeals at page 449, said: " The argument made in favor of this contention was very able and forcible, and yet it has not convinced me. The law commands these officers to value these franchises for the purpose of taxation, and it lays down no rules or methods to guide them in the discharge of their duties. It constitutes the special franchises real estate, and they are left to ascertain the value of such real estate, using all the rules and means of information which local assessors may call to their aid in valuing other real estate. They are not required to resort to what in legal proceedings would be called legal evidence. They may act upon hearsay, they may take the judgment of others, they may consult experts and resort to all the tests and information which they think will aid them in reaching the value with sufficient accuracy for the purpose of taxation; and they certainly can resort to all the means and evidence for the guidance of their judgment which private persons might use to reach the values of similar property in which they propose to invest their money. They may consider the cost of reproduction, the amount of business, the earning capacity, the location of the franchise, and all its advantages, and all the probabilities and possibilities relating to it, present and future. No matter what methods the assessing officers use to reach values in making their assessments the tax-

payer has no grievance unless his property has been over-valued; and for such a grievance he has his remedy by review before the assessors and a further review in the courts by writ of certiorari where, in an orderly legal proceeding in which he and his witnesses can be sworn, the whole matter may be again investigated. It is hard to conceive that under such a system the value of any species of property having value cannot be reached with sufficient accuracy for the purpose of taxation. The law does not attempt the impossible. We know how bungling and imperfect the work of assessors frequently is. They are frequently ignorant and incompetent and know very little or nothing as to the value of much of the property which they are bound to assess; and as to much property they can get very little accurate information for their guidance and can do little more than guess its value. But for all these imperfections alone their work cannot be condemned. If the result of their labors, even by mere chance, is a true valuation or an under-valuation, the taxpayer has no grievance; and if there be an over-valuation, he has the remedies above mentioned." And he concluded that " The assessment is undoubtedly attended with great difficulties. But it can be made with such an approximation to accuracy as will satisfy all the requirements of the law and of the Constitution." (See Referee's Opinion, Cases on Appeal, Supreme Court, Appellate Division, Third Department, pp. 715–717, 727, as on file in various Departments.)

In the present statute the class of property subject to the tax has been defined with sufficient clarity, and the assessing officers are charged with the duty of determining what property comes within its scope, with recourse to the courts in case any party deems himself aggrieved by their actions. Thus an ultimate judicial decision is assured, adjudging what property is properly subject to the tax as within the class defined by terminology having a fixed legal meaning.

What has been said as to the definiteness of the language used applies as well to the objection of lack of uniformity in the legislation. The class of taxable property to which it applies is uniformly defined. The question of what property answers its description only is left to the local assessing authorities. It is their duty to uniformly tax all found to come within the classification.

Nor, for the reasons above assigned, is there any delegation of legislative power to the local boards, for the property to be taxed having been clearly prescribed by the Legislature, the sole duty of the assessors was upon the facts before them to make the assessment as directed by the statute. Where the duties required to be performed by the local boards are solely ministerial, there is no

illegal delegation of power (*Village of Saratoga Springs* v. *Saratoga Gas, Electric Light & Power Company*, 191 N. Y. 123, 138); and that the exercise of such duties may require consideration of changing conditions affords no valid objection. (*People* v. *Fire Association of Philadelphia*, 92 N. Y. 311, 317.)

The second objection urged is that the arbitrary and unreasonable classification attempted by chapter 897 of the Laws of 1923 is in contravention of section 1 of the Fourteenth Amendment to the Constitution of the United States.

In *Bell's Gap Railroad Co.* v. *Pennsylvania* (134 U. S. 232) Mr. Justice BRADLEY said (at p. 237): " The provision in the Fourteenth Amendment, that no State shall deny to any person within its jurisdiction the equal protection of the laws, was not intended to prevent a State from adjusting its system of taxation in all proper and reasonable ways. It may, if it chooses, exempt certain classes of property from any taxation at all * * *. It may impose different specific taxes upon different trades and professions, and may vary the rates of excise upon various products; it may tax real estate and personal property in a different manner; it may tax visible property only, and not tax securities for payment of money; it may allow deductions for indebtedness, or not allow them. All such regulations, and those of like character, so long as they proceed within reasonable limits and general usage, are within the discretion of the State Legislature, or the people of the State in framing their Constitution. * * * We think that we are safe in saying, that the Fourteenth Amendment was not intended to compel the State to adopt an iron rule of equal taxation. If that were its proper construction, it would not only supersede all those constitutional provisions and laws of some of the States, whose object is to secure equality of taxation, and which are usually accompanied with qualifications deemed material; but it would render nugatory those discriminations which the best interests of society require * * * and which every State, in one form or another, deems it expedient to adopt."

In *Royster Guano Co.* v. *Virginia* (253 U. S. 412) the court said (at p. 415): " It is unnecessary to say that the ' equal protection of the laws ' required by the Fourteenth Amendment does not prevent the States from resorting to classification for the purposes of legislation. Numerous and familiar decisions of this Court establish that they have a wide range of discretion in that regard. But the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. The latitude of discretion

is notably wide in the classification of property for purposes of taxation and the granting of partial or total exemptions upon grounds of policy."

In *Barbier* v. *Connolly* (113 U. S. 27) the court said (at p. 31): " The Fourteenth Amendment, in declaring that no State ' shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,' undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; * * * that no impediment should be interposed to the pursuits of any one except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition."

And referring to special burdens often necessary for general benefits, said (at p. 32): " Though, in many respects, necessarily special in their character, they do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions. Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment."

And in *Hayes* v. *Missouri* (120 U. S. 68), citing the above decision, the court said (at p. 71): " The Fourteenth Amendment to the Constitution of the United States does not prohibit legislation which is limited either in the objects to which it is directed, or by the territory within which it is to operate. It merely requires that all persons subjected to such legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed."

In the recent case of *Heisler* v. *Thomas Colliery Co.* (260 U. S. 245, decided Nov. 1922) Mr. Justice McKENNA said (at p. 255): " And so classification has uses in government — indeed, we may say, necessities in government, for government as well as persons has purposes, varied and, at times, exigent, and its legislation must be accommodated to them, either in convenience or necessity. That government has the power to do so, we have often pronounced; not, however, omitting to recognize the restraints upon the power while expressing its range and adaptation. In its exercise in taxa-

tion, we have said, it is competent for a State to exempt certain kinds of property and tax others, the restraints upon it only being against ' clear and hostile discriminations against particular persons and classes.' Discriminations merely are not inhibited, for, it was recognized, that there are ' discriminations which the best interests of society require.' "

In *People ex rel. Farrington* v. *Mensching* (187 N. Y. 8) the Court of Appeals said (at p. 16): " We held [*People ex rel. Hatch* v. *Reardon*, 184 N. Y. 431] that ' the Legislature has power to classify as it sees fit by imposing a heavy burden on one class of property and no burden at all upon others,' provided ' all persons and property in the same class are treated alike ' and ' the tax is imposed equally upon all property of the class to which it belongs.' In discussing the subject we said that: ' While a tax upon a particular house, or horse, or the houses or horses of a particular man, or on the sale thereof, would obviously invade a constitutional right, still a tax upon all houses, leaving barns and business buildings untaxed * * * would be within the power of the Legislature. * * * The equal protection of the laws " only requires the same means and methods to be applied impartially to all the constituents of each class, so that the laws shall operate equally and uniformly upon all persons in similar circumstances." (*Kentucky Railroad Tax Cases*, 115 U. S. 321, 337.) Or, in other words, all persons must " be treated alike under like circumstances and conditions, both in the privilege conferred and the liabilities imposed." (*Magoun* v. *Illinois Trust & Savings Bank*, 170 U. S. 283, 293; *Hayes* v. *Missouri*, 120 U. S. 68; *Barbier* v. *Connolly*, 113 U. S. 27, 32.) ' "

And in *Matter of Keeney* (194 N. Y. 281; affd., 222 U. S. 525, 536) the Court of Appeals said (at p. 286): " The right and power of governments to single out certain classes of objects for taxation, leaving other classes exempt or taxed at a different rate, or in a different manner, is unquestionable. * * * Such power has been exercised by all governments from the earliest times."

And in *Hermitage Company* v. *Goldfogle* (204 App. Div. 710; affd., 236 N. Y. 554) this court said (at p. 726): " In my opinion, the permitted classification for exemption purposes of new buildings about to be erected and intended for residential purposes, was a reasonable and proper one. This was not a case of an arbitrary classification of existent buildings into separate groups, some of which were taxable, and some of which were not. It was an exemption from future local taxation, for a limited period, of property which was. to be created in return for that concession. * * * As was said in *Watson* v. *State Comptroller* (254 U. S. 122): ' Any classification is permissible which has a reasonable relation to

some permitted end of governmental action. *. * * It is enough, for instance, if the classification is reasonably founded in " the purposes and policy of taxation." ' "

I reach the conclusion, therefore, that there is nothing in the classification attempted in the statute which renders it invalid.

The third objection is that the act is unconstitutional and void in that the property subject to tax depends not upon the legislative body imposing the tax, but upon the action of Congress on a matter, disconnected from the tax sought to be imposed: (a) In that it is in contravention of the provisions of section 1 of the Fourteenth Amendment to the Constitution of the United States and article 1, section 6, of the Constitution of the State of New York, that no person shall be deprived of property without due process of law; (b) in that it is in contravention of the specific provisions of article 3, section 24, of the Constitution of the State of New York that every law which imposes a tax shall distinctly state the tax and the object to which it shall be applied, and that it shall not be sufficient to refer to any other law to fix such tax or object.

The answer to (a) is that the statute provides for proceedings by assessors, including a hearing, and a writ of certiorari to review such assessors' determination. As to (b) the act was an amendment of the General Tax Law of the State. In *People ex rel. Met. St. R. Co.* v. *Tax Comrs. (supra)* the referee said: " The act we are now considering [the Special Franchise Tax Law] is simply an amendment of the General Tax Law. It imposes no tax and appropriates or applies no money to any object, and therefore does not violate section 24 of Article 3 of the Constitution, which requires that ' every law which imposes, continues or revives a tax, shall distinctly state the tax and the object to which it is to be applied.' (In *Matter of McPherson,* 104 N. Y. 306; *Jones* v. *Chamberlain,* 109 N. Y. 100.) If this objection could avail I do not see why it would not condemn the whole chapter of laws of which the special franchise tax is simply an amendment." (See Referee's Opinion, Cases on Appeal, Supreme Court, Appellate Division, Third Department, p. 736, as on file in various Departments.)

The fourth objection is that the failure of an essential provision, section 27 of the act, through its non-fulfillment of the requirements of section 21 of article 3 of the Constitution of the State of New York, inhibiting the payment of State money except in pursuance of an approprfation by law specifying the sum and object, and the violation of section 9 of article 8 of the Constitution, providing that neither the credit nor the money of the State shall be given or loaned to or in aid of any association, corporation or private undertaking, invalidates the whole act.

It seems to me that the argument of the learned counsel for appellants on this objection is sound. This is that " Section 27 was an entirely distinct provision of Chapter 897, Laws of 1923, and in no way related to amendments of the Tax Law, which amendments in themselves provided a complete and harmonious plan for equal taxation under such amendments and whereby any double taxation as to moneyed capital by local taxation at actual value and State taxation based upon income from such moneyed capital would be avoided. Such amendments related to annual assessment and taxation for the year 1923 and subsequent thereto. While there is no illegality in, and the Legislature might within its authority provide for double taxation, the amendments did not require it.

" Accordingly while providing by the amendments of the Tax Law for such local assessment and taxation of moneyed capital for 1923, the Act also by such amendments taking effect at the same time, provided, both as to franchise tax on business corporations measured by income under Article 9A, by amendment of Section 208 of the Tax Law, and as to individual income tax under Article 16, by amendment of Section 359 of the Tax Law, that in imposing such taxes, income from ' dividends on shares of trust companies subject to franchise tax as provided by section 188 of this chapter,' and ' income from dividends on shares of banks and banking associations [taxable] as provided by article two of this chapter ' and ' income received from moneyed capital taxable as provided by article two of this chapter,' should be excluded or deducted. Each of these related to income from moneyed capital for the year 1923, payable in the following year. As to individual income taxes these three deductions were provided by inserting in Section 359 paragraphs ' j,' ' k,' and ' l ' of subdivision 2 thereof.

" As 1923 was the first year of tax on moneyed capital under the amendments of the Tax Law by Chapter 897, Laws of 1923, there could be no double taxation of moneyed capital for the year 1922. In that year such moneyed capital was taxable on income only and thus it is not the fact that without section 27, the bill as a whole would have provided for two taxes on this class of property for the year 1923. Paragraphs ' j,' ' k,' and ' l ' of subdivision 2 of Section 359 were added to the Tax Law upon the taking effect of Chapter 897, Laws of 1923, on June 1, 1923, and when the taxpayer made return of his taxable net income for 1923, he was authorized to exclude therefrom income derived from such moneyed capital taxable locally for 1923. There having been no moneyed capital local tax for the year 1922, there should be no refund of the tax upon income derived therefrom, and thus the argument of invalidity because no appropriation was made for such refund, becomes academic."

Even if this argument should not be accepted, there is still the answer to the objection that section 27 is clearly severable from the essential provisions of the statute, and, therefore, even its invalidity would not destroy the rest of the statute.

Finally, it is contended that the statute became a law too late to authorize assessments under it for the year 1923.

The act provides that it take effect immediately. Inasmuch as its provisions are made a part of the General Tax Law, pursuant to which assessment rolls are made up as of August first, and due notice thereof and of hearing is thereupon given, and the third Tuesday of August is made the grievance day, thus assuring due process of law, every inference that can reasonably be drawn from the entire act clearly indicates that it is applicable to the year 1923.

I thus reach the conclusion that the learned justice at Special Term was right in his painstaking, well-considered and convincing opinion (123 Misc. 399) in which he upheld the validity of the statute in question. Coming to the facts in this particular case, two questions are presented by appellants: (1) Whether the business or enterprise in which the relator's capital was invested included operations such as National banks in their general banking business under their specified statutory powers (U. S. R. S. § 5136) are engaged in, and hence such capital came into competition with the business of National banks. (2) Whether it appears that the amount of the assessment as made by the defendants was in excess of the actual value of the taxable capital so invested by the relator.

The facts are stipulated, and are as follows: Relator, a resident of New Rochelle, was a partner in J. S. Bache & Co., whose principal office was at 42 Broadway in the city of New York. He had capital invested in transacting the business of the firm comprising a proportionate interest in the firm's net assets, and also had capital invested in a stock exchange seat, he being engaged in no other business than as a member of the firm and owning no other moneyed capital in connection with such business. It further appeared from the stipulation that the business of the firm in which all of its capital was available, changing in amount and form from day to day, included: (1) Dealing in stocks, bonds and commodities, for cash, in execution of orders of customers for which a commission was charged. (2) Purchase and sale of stocks, bonds and commodities, for the firm's customers upon marginal accounts, customers being charged a commission for such purchases and sales. In executing an order for the purchase of stocks, bonds and commodities for a customer upon margin, the firm first received from the customer a deposit of cash or securities to be applied on account of the purchase or held as

security for the payment of the margin. The firm then loaned to the customer the difference between the purchase price and the amount so deposited with the firm on account, and took as security therefor the stocks, bonds or evidences of ownership of said commodities purchased, and charged him interest on the amount so loaned. To effect such loan to the customer, the firm borrowed from banks, trust companies and individuals the money loaned to the customer, in whole or in part, at times rehypothecating the bonds, stocks and evidences of ownership so purchased as collateral. In the transaction the firm advanced the difference between the amount which it was able to borrow from the banks or others upon such rehypothecation and the amount which it loaned to the customer. (3) Dealing on the firm's own account in stocks, bonds and evidences of debt, including engaging in syndicate transactions, and not only purchase and sale of securities but subscriptions to and purchase of original issues for the purpose of reselling the same.

It cannot be contended that items 1 and 3 constitute competition with the business of National banks. As to item 2, so far from competing with the business of National banks, the relator's firm actually furnished them with business. It supplemented this business of the bank and made it possible, by advancing the difference between what the bank was willing to advance upon the rehypothecated securities and the balance required to buy the stocks for its customer, over and above his margin. The firm had no interest save to earn its commissions upon the purchase of the stocks. It was not anxious to earn interest on a loan; it was concerned with effecting a purchase to earn its commissions. As the customer did not have, or was unwilling to advance, the total purchase price, some provision had to be made for the difference between his payment and the cost. If the broker could get the whole amount of this difference from a bank, he would be glad to obtain it without any advance on his part. It was only because the bank would not loan the total sum of this difference that the broker was obliged to advance part of it. He doubtless would prefer to have the bank advance it all. So far from being a competitor of the bank, he was a feeder of business to it, supplementing and making possible its loans to the extent that he had to make good the remaining balance of the purchase price of the stocks. In fact his contribution served to increase the bank's margin of safety on its loan.

Appellants claim that relator should be taxed upon the value ($90,000) of his membership in the New York Stock Exchange, which he used in the transaction of the business of the firm. This

membership was used in connection with the brokerage business of the firm and for the purpose of enabling him to buy and sell the stocks in which it dealt, either for its customer's account or for its own. As National banks cannot own memberships in an exchange nor trade or deal in stocks, in my opinion the value of this membership did not constitute capital competing with National banks, and is not taxable as such.

It follows, therefore, that the learned justice at Special Term correctly vacated and canceled the assessment made against the relator, and that the order appealed from should be affirmed, with ten dollars costs and disbursements.

Clarke, P. J., Finch, McAvoy and Martin, JJ., concur.

Order affirmed, with ten dollars costs and disbursements.